USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Feb. 24, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------- X
UNITED STATES OF AMERICA            :
                                    :
                                    :
    -against-                       :
                                    :        11 Cr. 755 (JFK)
JOVANNY RODRIGUEZ a/k/a "Johnny,"   :        **OPINION & ORDER**
and JESUS HILARIO-BELLO a/k/a       :
"Charlie,"                          :
                                    :
                    Defendants.     :
---------------------------------- X

APPEARANCES

UNITED STATES OF AMERICA
     Preet Bharara
       United States Attorney, Southern District of New York
     By:  Ryan Poscablo
          Jessica Ortiz
          Megan Gaffney

FOR JOVANNY RODRIGUEZ
     Peter E. Brill

FOR JESUS HILARIO-BELLO
     Steven F. Pugliese

**JOHN F. KEENAN, United States District Judge:**

     Before the Court are Defendants' motions for a judgment of
acquittal pursuant to Rule 29 of the Federal Rules of Criminal
Procedure, and for a new trial pursuant to Rule 33.  For the
reasons explained below, the motions are denied.

## I. Background

     During the three-week trial, the Government offered
evidence to support fifteen charges against Defendants Oscar

Minaya,[1] Jovanny Rodriguez, and Jesus Hilario-Bello ("Bello").
The fifteen counts charged in the trial indictment, Superseding
Indictment 13, included conspiracies to commit Hobbs Act
robberies (Count One) and kidnappings (Count Two); substantive
Hobbs Act robberies (Counts Four, Seven, Eight, Nine, Ten, and
Thirteen) and kidnappings (Counts Five and Eleven); firearms
charges in connection with the robbery and kidnapping
conspiracies (Count Three), as well as in connection with the
substantive robberies and kidnappings (Six, Twelve, and
Fourteen); and a conspiracy to distribute narcotics (Count
Fifteen).  The indictment charged Rodriguez with Counts One,
Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven,
Twelve, and Fifteen.  Bello was charged with Counts One, Two,
Eight, Thirteen, Fourteen, and Fifteen.

At trial, the Government's evidence primarily consisted of
testimony from cooperating accomplice witnesses and victims.  It
also included pictures, videos, and law enforcement testimony.
The Government also offered evidence that Minaya's mother, Siri
Minaya, attempted to influence a witness's testimony.

At the end of the trial, the jury found Bello guilty of all
counts against him and found Rodriguez guilty of all counts
against him except for Count Three.  The Court discusses the
evidence only insofar as it is relevant to the instant motion.

---

[1] Minaya did not move for a new trial or acquittal.

## A. Counts One and Two

The Government alleged twelve overt acts in furtherance of the robbery conspiracy and six overt acts in furtherance of the kidnapping conspiracy.  The overt acts included each of the substantive robberies and kidnappings as well as other incidents.  In setting forth the evidence as to Counts One and Two, the Court discusses the incident that occurred on February 25, 2011, near Northern Boulevard in Queens.  This kidnapping was charged as an overt act in furtherance of both the robbery and kidnapping conspiracies.  It involved both Bello and Rodriguez and was not separately charged as a substantive crime.

The evidence supporting these counts consisted in great measure of testimony from Domingo Bautista, a cooperating accomplice witness.  The jury also heard from the victim, Felicia Nardello.  According to Bautista, Minaya was the santero, or tipster, and informed the crew that Nardello's husband kept over a million dollars in their home related to his construction business. Bautista testified that he, Rodriguez, and another individual spent two weeks surveilling the victim. On the day of the attack, Bautista, Rodriguez, Bello, and others met before the incident to coordinate.  Rodriguez's van was out of order, so he used someone else's van to drive co-conspirators to the scene of the attack.  Bello, along with other crew members, travelled to Nardello's house in the van driven by

Rodriguez, while Bautista travelled with others in another car. When Nardello came home, crew members attacked her and threw her into the van driven by Rodriguez and containing Bello and others.  Rodriguez drove to the highway and pulled off at an exit, where another crew member took Nardello's keys.  While Rodriguez drove Nardello and Bello, other crew members returned to her home, which was protected by an alarm system.  While Nardello was still in the back of the Rodriguez van, an English speaking crew member talked with her over the phone to get the alarm code. (Trial Tr. 178-87.)

Inside the house, crew members found and took poker chips, $55,000, and jewelry. (Trial Tr. 188, 675.)  Those crew members called Rodriguez and told him to let Nardello go.  (Trial Tr. 189.)  The crew members left Nardello's home and went to a friend's house where they began splitting up the money. (Trial Tr. 190.)  Rodriguez and Bello met them later at a jewelry store, where Rodriguez and Bello were given their shares. (Trial Tr. 190-91.)

## B. Counts Four, Five, and Six

Counts Four, Five, and Six arose out of an incident that occurred on December 21, 2010, near 162nd Street and Riverside Drive in Manhattan.  The evidence established that Minaya was the santero for this job and that the target was a drug dealer

4

named Raul who dated Minaya's girlfriend, Arleth Martinez. (Trial Tr. 230-31, 817.)

Bautista and Richard Trejo, another cooperating accomplice witness, testified that Rodriguez drove Bautista, Minaya, and another individual around so that Minaya could show them where Raul worked and where he parked his car. (Trial Tr. 232-33, 858.)  On the night of the crime, Rodriguez drove Bautista and another individual to Martinez's apartment, where Raul was expected. (Trial Tr. 233-34, 860-61.)  When Raul arrived, crew members jumped him and threw him into Rodriguez's van at gunpoint. (Trial Tr. 237-38, 863-64.)  While Rodriguez drove, one of the crew members struck Raul on the back of the head with a gun. (Trial Tr. 238-39.)  Raul then told the crew in the van that he kept his drug money at his Manhattan apartment. (Trial Tr. 240.)  Someone in the van directed the other crew members to Raul's apartment, where they found over $400,000. (Trial Tr. 230, 867-68.)

Rodriguez and the others in the van then left Raul on the side of the highway. (Trial Tr. 241.)  Rodriguez later joined the crew as they distributed the money. (Trial Tr. 241-42, 868-69.)  At first, he only received $21,000. (Trial Tr. 243.)  According to testimony from Juan Marte, a cooperating witness, Rodriguez was upset about the amount of money he received. (Trial Tr. 557.)  Bautista testified that he and another crew

member gave Rodriguez more money after Rodriguez realized he received less money than others. (Trial Tr. 243.)

### C. Count Seven

Count Seven arose out of conduct that occurred sometime in 2010 near 183rd Street in the Bronx.  Testimony from Bautista and Marte provided most of the evidence for this charge.

According to Bautista, the santero for this robbery alerted the crew that a man would put a suitcase containing nearly ten kilograms of cocaine into the back of a black cab.  Bautista testified that Rodriguez and another crew member went to survey the building on 182nd Street in the Bronx where they believed the man had the suitcase. (Trial Tr. 255–57.)

On the day of the job, the crew used two vehicles, one of which was Rodriguez's van. (Trial Tr. 256, 539.)  They saw a man come out of the building and place a suitcase into the back of a black cab before getting into the cab himself. (Trial Tr. 257, 541.)  Bautista and Rodriguez followed the cab in the van that Rodriguez was driving. (Trial Tr. 257.)  After the man exited the cab at a bodega, Rodriguez and Bautista continued to follow the cab. (Trial Tr. 257–58, 541.)  Rodriguez used his van to cut off the cab, and Bautista jumped out to point a BB gun at the cab driver. (Trial Tr. 258, 541–42.)  At this point, Rodriguez removed the keys from the cab's ignition and then opened the

6

cab's trunk. (Trial Tr. 258, 542.)  Bautista removed the suitcase from the trunk. (Trial Tr. 258, 542.)

Bautista and Rodriguez took the suitcase back to Rodriguez's house. (Trial Tr. 258, 543.)  They found seven or eight kilograms of cocaine in the suitcase. (Trial Tr. 258, 543.)  The cocaine was portioned out to the crew members with Rodriguez and Bautista each receiving one kilogram and Marte receiving nine hundred grams. (Trial Tr. 259, 543.)  According to Bautista, he sold his cocaine to another crew member. (Tr. 259.)  Although it is not clear from the record what Rodriguez did with his share of the cocaine, Bautista testified that Rodriguez called someone else because the quoted price was too low. (Trial Tr. 259.)

### D. Count Eight

Count Eight arose out of conduct that occurred sometime in 2010 near Croes Avenue in the Bronx.  The evidence consisted primarily of testimony from Bautista and Trejo.

Bautista and Trejo testified that Trejo was the santero for the job. (Trial Tr. 215, 843.)  Trejo told the crew about a barber who also dealt heroin. (Trial Tr. 215-16, 844.)  According to Bautista, he spent a week surveilling the barber with Rodriguez in Rodriguez's van. (Trial Tr. 216, 845.)  On the night of the robbery, the crew met near the barber's shop around 186th Street and St. Nicholas Avenue in Manhattan. (Trial Tr.

216-17, 848.)  The crew used three vehicles, including
Rodriguez's van and Bello's red Nissan Quest. (Trial Tr. 217.)

When the barber left work, the three vehicles followed him
home. (Trial Tr. 218, 848-49.)  The crew members driven by Bello
attacked the barber and threw him into the back of Bello's
vehicle. (Trial Tr. 218-19, 849.)  As Bello drove, the other
crew members continued to beat up the barber until he disclosed
the location of the drugs. (Trial Tr. 219-20.)  After everyone
arrived at the disclosed location, three crew members went into
the building, tied up a man inside, and took two bags containing
roughly one-and-a-half to two kilograms of heroin. (Trial Tr.
220-22, 851-52.)  The crew then left the barber on the side of
the highway. (Trial Tr. 221-22.)

Afterward, the co-conspirators met to divide up the drugs.
(Trial Tr. 222, 855.)  It was then that Trejo was introduced to
Bello. (Trial Tr. 853.)  The two bags contained approximately
half a kilo of unprocessed heroin, as well as smaller bags of
heroin. (Trial Tr. 854-55.)  According to Trejo, Bello and
Rodriguez helped count the small bags of heroin, which were then
divided among the crew. (Trial Tr. 855.)  The crew also assigned
three members to sell the drugs. (Trial Tr. 222-23.)  Trejo
testified that Rodriguez and Bello each received a portion of
the heroin.  (Trial Tr. 856.)  Trejo testified that the crew
later combined their remaining shares of heroin and asked him to

sell it. (Trial Tr. 856.)  Rodriguez and Bello received proceeds
from Trejo's sale of the heroin. (Trial Tr. 223.)

### E. Count Nine

Count Nine arose out of an event that occurred sometime in
2010 near 187th Street in the Bronx.  The evidence consisted
primarily of testimony from two cooperating accomplice
witnesses, Bautista and Carlos Villalona.

Bautista testified that he met with Rodriguez and another
crew member to discuss robbing a man who kept drugs in his
apartment. (Trial Tr. 250.)  Villalona and Bautista both
testified that on the afternoon of the robbery they met with
crew members, including Rodriguez, to discuss the robbery.
(Trial Tr. 251, 720.)  That evening when the man returned home,
crew members jumped him, put him in a van, and took his keys,
his wallet containing approximately $3,000, and roughly three
kilograms of cocaine. (Trial Tr. 252, 722-24.)

While Rodriguez served as a lookout, several crew members
entered the man's apartment and returned with bags of drugs.
(Trial Tr. 253, 725-27.)  Rodriguez then drove the crew in his
van to Villalona's house (Trial Tr. 253-54, 725-27.)  At
Villalona's house, they examined the drugs. (Trial Tr. 254.)
There were approximately five kilograms of cocaine and more than
four hundred grams of heroin. (Trial Tr. 254, 727.)  Two crew
members coordinated the sale of the drugs, and the proceeds were

split among all the crew members. (Trial Tr. 254, 727–28.)

Bautista testified that he received $8,000 and expected

Rodriguez to get more than him because Rodriguez was "inside

that job." (Trial Tr. 254.)  Villalona testified that Rodriguez

likely received $12,000 to $15,000 after the sale of the drugs.

(Trial Tr. 727–28.)

### F. Counts Ten, Eleven, and Twelve

Counts Ten, Eleven, and Twelve arose out of conduct that

occurred on May 15, 2011, near 148th Street in Queens.  The

victim, Gregorio Nunez, owned bodegas and ATMs.  The evidence

presented at trial included testimony from Nunez, Bautista, and

Edwin Henriquez, another cooperating witness.

According to testimony from the cooperating witnesses,

Rodriguez and others met to plan the job. (Trial Tr. 159, 978.)

Henriquez testified that he then conducted surveillance with

Minaya and Rodriguez. (Trial Tr. 978.)  Bautista testified that

he always talked with Rodriguez about whether or not to bring a

gun to a job and did so while planning this one. (Trial Tr. 160–

61.)  One of the crew members was told to bring a gun, which he

did. (Trial Tr. 160–61.)  Rodriguez's van was one of the

vehicles used for the job. (Trial Tr. 983.)  During the job, a

crew member pointed a gun at Nunez while others abducted Nunez

and threw him in the other van. (Trial Tr. 46, 165, 988–89.)

While this occurred, Rodriguez was nearby wearing a fake police

badge. (Trial Tr. 989.)  He then drove away in his van with
another crew member, and followed the van with Nunez in it.
(Trial Tr. 989.)

Inside the other van, Nunez was struck on the back of the
head with a hard object, which Henriquez identified as a
revolver. (Trial Tr. 48, 990.)  Someone in the van took Nunez's
two cell phones, a chain, and $500 in proceeds from his ATM
business. (Trial Tr. 43-44, 47-48, 177.)  The crew took Nunez to
a parking garage that Minaya's friend had rented. (Trial Tr.
991.)  Rodriguez was with other crew members and parked his van
down the road from the garage. (Trial Tr. 168-69, 992.)  In the
garage, some crew members continued to beat Nunez. (Trial Tr.
49.)  Meanwhile, other co-conspirators went to Nunez's house
expecting to steal money. (Trial Tr. 994-95.)  However, police
were present at Nunez's home, so the crew returned to the
garage. (Trial Tr. 48-49, 170, 994-95.)  Back at the garage, a
crew member pointed a gun at Nunez's head and made him call a
friend to demand $3 million. (Trial Tr. 53, 171.)  When the
friend did not show up with the money, they left Nunez on the
side of the road, stripping him to his underwear. (Trial Tr. 58,
174.)

### G. Counts Thirteen and Fourteen

Counts Thirteen and Fourteen arose out of the events that
transpired on June 10, 2011, at the home of Rivka Rosenberg on

Grist Mill Lane in Great Neck.  The evidence at trial included testimony from Bautista, Marte, Ms. Rosenberg, and Leli Berrios, who was a nanny for Rosenberg's neighbor.

According to Bautista, he had surveilled the Rosenberg house with Minaya and Bello.  The morning of the robbery, Bello called Bautista to do the job, but Bautista could not go because his daughter was sick.  Bautista told Bello to take a gun. (Trial Tr. 261-62.)

Ms. Rosenberg testified that she returned home from shopping and was attacked by two men in her home. (Trial Tr. 1229.)  One of the men, later identified by Bautista as Minaya, drew a gun. (Trial Tr. 1231.)  The men hit her and demanded money from her safe. (Trial Tr. 1231.)  Minaya pulled out three bullets and said that one was for her, one was for her son, and one was for her husband. (Trial Tr. 263, 1231.)  Rosenberg saw that her jewelry drawer was emptied and gave the men what she thought was approximately $5,000 worth of euros. (Trial Tr. 263, 1232-33.)  Before the men left, they tied her up on her bed. (Trial Tr. 263, 1233-35.)  After they left, Rosenberg realized that they had also taken checks and cash that came from the rent her husband collected from real estate they own. (Trial Tr. 1236-37.)

After the robbery, Bautista heard about it from Angelo Michel, who had participated in it. (Trial Tr. 262.)  Michel

confirmed that a gun was used and that he and Minaya robbed the woman while Bello waited in his red Nissan. (Trial Tr. 263.) Bautista also spoke with Bello after the robbery.  Bello told Bautista that Minaya used Bello's gun. (Trial Tr. 264.) Bautista also testified that both Michel and Bello confirmed that they stole money and jewelry, and Marte testified he heard the same from Bello. (Trial Tr. 263–64, 558.)  Michel told Bautista that the jewelry, dollars, and euros were worth approximately $15,000. (Trial Tr. 263.)  According to Marte, Bello told him that he drove his red Nissan to the job. (Trial Tr. 558–59.)  Berrios testified that she saw a red car in front of Rosenberg's house on the day of the robbery. (Trial Tr. 1165.)

### H. Count Fifteen

As to the narcotics conspiracy, see <u>infra</u> pp. 21–23 for Rodriguez and pp. 24–25 for Bello.

### I. Minaya's Mother

During the trial, it came to light that, in connection with Counts Four, Five, and Six, Minaya's mother apparently attempted to persuade Arleth Martinez not to testify.  The Government's evidence included testimony from Luis D. Rodriguez—a special investigating technician for the Federal Bureau of Prisons—and George Vasquez, a friend of Martinez. (Trial Tr. 1254–87.) Vasquez testified that he answered a phone call from a blocked

13

number and heard a recording that said the call was from a
prison. (Trial Tr. 1279-80.)  Vasquez did not accept the call.
(Trial Tr. 1280.)

After receiving a few other calls from a blocked number, he
received a call from someone identifying herself as Minaya's
mother. (Trial Tr. 1281-82.)  The woman told Vasquez to tell
Martinez not to appear in court. (Trial Tr. 1282.)  Luis
Rodriguez prepared a CD containing recordings of phone
conversations between Minaya and his mother. (Trial Tr. 1256-
62.)

The Government argued that these calls showed that Oscar
Minaya knew that his mother was attempting to contact Martinez
to persuade her not to testify.  Bello did not object to the
testimony and did not cross-examine either witness.  The jury
received the following charge:

> You have heard testimony that the defendant Oscar
> Minaya attempted to contact a witness to prevent her
> from testifying, whom he believed was to be called by
> the government against him.  The evidence is only
> admitted as to Oscar Minaya and Mr. Minaya is not on
> trial for those charges.  You may not consider such
> evidence as a substitute for proof of his guilt in
> this case.
> However, if you find that the defendant Oscar
> Minaya did attempt to contact a witness to prevent her
> from testifying whom he believed the government was
> going to call, you may, but are not required to, infer
> that the defendant believed that he was guilty of the
> crimes for which he is charged.
> Whether or not the evidence of the defendant
> Oscar Minaya's attempt to contact a witness shows that
> the defendant believed that he was guilty of the crime

14

for which he is now charged and the significance, if
any, to be given such evidence, is for you, the jury,
to decide.

(Trial Tr. 1713-14.)

## II. Discussion

### A. Legal Standard

#### 1. Rule 29 of the Federal Rules of Criminal Procedure

"[T]he court on the defendant's motion must enter a
judgment of acquittal of any offense for which the evidence is
insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).
A defendant seeking acquittal based on sufficiency of the
evidence "bears a heavy burden." United States v. Desena, 260
F.3d 150, 154 (2d Cir. 2001).  Specifically, a conviction will
be sustained unless no rational trier of fact could have found
the essential elements of the charged crime beyond a reasonable
doubt. See United States v. Jackson, 345 F.3d 59, 65 (2d Cir.
2003).  As such, this Court must look at the evidence in the
light most favorable to the Government. Id.; see also United
States v. Abelis, 146 F.3d 73, 80 (2d Cir. 1998) ("We view the
evidence as a whole in the light most favorable to the
government, drawing all inferences and resolving all issues of
credibility in the government's favor." (internal quotation
marks omitted)).  In weighing the sufficiency of the evidence,
"courts must be careful to avoid usurping the role of the jury."
United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004)

(internal quotation marks omitted).  This Court will not
"substitute its own determination of . . . the weight of the
evidence and the reasonable inferences to be drawn for that of
the jury." Id. (internal quotation marks omitted; alteration in
original).

This level of deference "is especially important when
reviewing a conviction for conspiracy . . . because a conspiracy
by its very nature is a secretive operation, and it is a rare
case where all aspects of a conspiracy can be laid bare in court
with the precision of a surgeon's scalpel." United States v.
Eppolito, 543 F.3d 25, 46 (2d Cir. 2008) (internal quotation
marks omitted).  Thus, "[t]he existence of and participation in
a conspiracy may be established through circumstantial
evidence." United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.
1992).  Even so, a defendant's "mere presence at a crime scene
or association with conspirators does not establish intentional
participation in the conspiracy, even if the defendant has
knowledge of the conspiracy." United States v. Santos, 449 F.3d
93, 104 (2d Cir. 2005) (internal quotation marks omitted).
Nevertheless, a defendant's "presence may establish his
membership in the conspiracy if all of the circumstances
considered together show that by his presence he meant to
advance the goals of that conspiracy." Abelis, 146 F.3d at 80
(internal quotation marks omitted).  If a conspiracy is shown to

exist, "it does not take overwhelming proof to link additional defendants to it." <u>United States v. Desimone</u>, 119 F.3d 217, 223 (2d Cir. 1997).

### 2. Rule 33 of the Federal Rules of Criminal Procedure

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).  Although a court's discretion is broader under Rule 33 than Rule 29, "that discretion should be exercised sparingly." <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414 (2d Cir. 1992).  "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice." <u>United States v. Aguiar</u>, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and alterations omitted).  Thus, "[t]here must be a real concern that an innocent person may have been convicted." <u>United States v. Ferguson</u>, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).  There is no such concern in this case.

### B. Application

#### 1. Sufficiency of the Evidence Against Rodriguez

##### a. Counts One, Two, Four, Five, Seven, Eight, Nine, Ten, and Eleven

The main thrust of Rodriguez's argument as to these counts is that Rodriguez's association with the conspirators and "mere presence" at the crime scenes is insufficient as a matter of law

to establish his participation in the conspiracy.  However,
unlike Santos, the case on which he relies, there was ample
evidence for the jury to conclude that Rodriguez participated in
the charged crimes as well as the overarching conspiracies.

The evidence viewed in the light most favorable to the
Government shows that Rodriguez was more than just present at
the crime scenes.  According to the testimony of cooperating
witnesses, he often met with co-conspirators to plan the crimes
with them beforehand.  Additionally, in each of the substantive
robberies and kidnappings, Rodriguez drove a van (often his own)
and shuttled co-conspirators.  On at least one job, his van was
used to detain the victim.  On another job, Rodriguez even used
his van to block a victim's car and took the victim's keys while
another crew member pointed a BB gun at the victim.  Rodriguez
himself characterizes the cooperating witnesses' testimony as
peppered with "references to Mr. Rodriguez being present at many
of the planning meetings and as a driver for many of the
crimes." (Rodriguez Mem. 3.)  This evidence is sufficient for a
rational jury to find the elements of the conspiracies charged
in Counts One and Two.

For similar reasons, the evidence is sufficient to support
convictions on each of the substantive counts.  For Counts Four
and Five, Rodriguez drove crew members around while they
conducted surveillance.  He drove co-conspirators to the job and

drove around while they hit Raul in the back of his van.  While
he drove Raul, other crew members stole over $400,000 in drug
money from Raul's apartment.  This evidence is sufficient to
convict on both the robbery and kidnapping charged in Counts
Four and Five.

On the robbery associated with Count Seven, Rodriguez also
conducted surveillance.  Testimony also established that during
the job Rodriguez used his van to block the cab containing a bag
of cocaine.  He took the driver's keys and opened the trunk so
that Bautista could remove the cocaine.  That testimony is
sufficient to establish the elements of the robbery charged in
Count Seven.

For the Count Eight robbery of the barber, Rodriguez again
conducted surveillance prior to the robbery.  According to
cooperators' testimony, Rodriguez also drove crew members to the
job and received a share of the stolen heroin and proceeds from
the sale of the drugs.  That testimony is sufficient to
establish the elements of the robbery charged in Count Eight.

On Count Nine, Rodriguez discussed the robbery with
Bautista beforehand.  Testimony established that Rodriguez
served as a lookout while other crew members entered the
victim's house to steal drugs.  He then drove the crew members
away from the job so that everyone could divide up the drugs at
a co-conspirator's house.  This evidence, viewed in the light

most favorable to the Government, is sufficient to support his conviction on Count Nine.

As to Counts Ten and Eleven, testimony established that Rodriguez helped plan the job and conducted surveillance.  He also shuttled crew members to and from the scene of the attack. During the attack, the victim was abducted and driven around in another van.  Inside the van, a co-conspirator stole $500 in proceeds from the victim's ATM business, as well as his two cell phones and a chain.  Construing the evidence in the light most favorable to the Government, the elements are satisfied for Counts Ten and Eleven.

Finding the evidence sufficient to support the charged conspiracies and substantive robberies and kidnappings, the Court denies Rodriguez's motion for acquittal as to Counts One, Two, Four, Five, Seven, Eight, Nine, Ten, and Eleven.

### b. Counts Six and Twelve

On Counts Six and Twelve, Rodriguez argues that there was no evidence that he used or possessed a firearm in connection with a charged robbery or kidnapping.  Moreover, he argues that there was insufficient evidence to demonstrate that he knew that a firearm would be used.

His arguments are undercut, however, by Bautista's testimony.  According to Bautista, he always talked to Rodriguez about whether or not they would use a gun for a job.  Concerning

Count Six, Bautista testified that one of the crew members pointed a gun at Raul while others pushed him into Rodriguez's van.  The same crew member hit Raul with a gun while Rodriguez drove them around in his van.

For Count Twelve, Bautista testified that he talked with Rodriguez about using a gun to rob and kidnap Nunez.  During the attack on Nunez, a crew member used a gun to threaten Nunez before the crew threw Nunez into another van.  Although Rodriguez did not drive the van containing Nunez, he was present during the abduction while wearing a fake police badge and later transported other crew members in his van while Nunez was hit with the gun in another.

Construing this evidence in the light most favorable to the Government, not only did Rodriguez discuss the use of a gun before each charged gun offense, he also aided and abetted the use of the gun by participating and taking an active role in each job as a driver. See United States v. Gomez, 580 F.3d 94, 103 (2d Cir. 2009) (sufficient evidence for aiding and abetting the use of a firearm where defendant acted as a lookout).  As such, the evidence is sufficient to support his conviction on Counts Six and Twelve.

### c. Count Fifteen

As to Count Fifteen, Rodriguez argues that there was insufficient evidence to show that he agreed with another co-

conspirator to distribute narcotics.  He contends that the evidence suggests that he expressed an interest in selling the drugs he received from the jobs but did not deal with the individual that the other crew members used to sell their drugs. However, his characterization satisfies the elements of the crime alleged.  Since the crew agreed to obtain drugs in order to sell them, the fact that Rodriguez intended to sell the drugs to someone else does not remove him from the conspiracy. See United States v. Berger, 224 F.3d 107, 114–15 (2d Cir. 2000) (noting that a singular conspiracy exists when members "share a common goal and depend upon and assist each other" even if the members operate in multiple groups or separate spheres).

Moreover, Rodriguez was actively involved in procuring drugs from victims.  He also helped to divide the drugs among co-conspirators and received money from the sale of those drugs. On one job, Rodriguez helped surveil the victim who had placed a bag of cocaine in the back of a black cab.  Rodriguez also stole the cab driver's keys and opened the trunk so that Bautista could grab the cocaine.  Rodriguez was present when the crew received their shares of that cocaine.  He called another person when the crew's dealer quoted him a low price on the cocaine.

On another job, he helped surveil the barber who sold heroin.  His van was used during the job, which netted nearly two kilograms of heroin.  After regrouping, Rodriguez helped

count and divide the drugs among the crew members.  He not only received a portion of the heroin, he also later received money from the sale of the remaining heroin.

Finally, Rodriguez used his van during the robbery near 187th Street in the Bronx, and served as a lookout while crew members stole heroin and cocaine from inside the victim's apartment.  The crew split up the drugs in order to sell them, and Rodriguez received over $8,000 from the proceeds because he was "inside that job."  This evidence allowed the jury to find that Rodriguez intended to advance the goals of the narcotics conspiracy charged as Count Fifteen.

The Court thus finds sufficient evidence to satisfy the charge for each conspiracy and substantive crime.  Rodriguez's Rule 29 motion is therefore denied as to all counts.

### 2. Rodriguez's Rule 33 Motion

Rodriguez argues that this case presents an exceptional circumstance where the "testimony is patently incredible or defies physical realities." (Rodriguez Mem. 2.)  However, he points to no testimony to support this assertion, and the Court finds nothing incredible about the testimony offered at trial. There being no other reason to consider the verdict against Rodriguez manifestly unjust, his motion for a new trial is denied.

### 3. Evidence Against Bello

### a. Counts Eight and Fifteen

Bello challenges the sufficiency of the evidence to convict him for Count Eight.  He acknowledges, however, that both Bautista and Trejo provided testimony connecting him to that robbery.  There, his red Nissan was used to transport crew members when they attacked the barber, who was then thrown into the back of the vehicle.  While Bello drove, crew members beat the barber until he disclosed the location of his drugs.  The crew then went to that location and stole the barber's drugs.  Construed in the Government's favor, this testimony is sufficient to support Bello's conviction as to the robbery charged in Count Eight.

Testimony concerning this job also provides sufficient support for Bello's conviction on Count Fifteen.  Construing the evidence in the light most favorable to the Government, after the crew robbed the barber, Bello helped apportion the heroin that was distributed to the crew members.  He then received a portion of the heroin and later received a cut of the proceeds from the sale of the remaining heroin.  A reasonable jury could find that Bello's role as a driver in the underlying robbery, which netted the crew roughly two kilograms of cocaine, coupled with his help counting the bags of heroin, demonstrated his intent to advance the narcotics conspiracy.  This is further

24

supported by testimony that he received a portion of the heroin
as well as proceeds from the sale of the heroin.

### b. Counts Thirteen and Fourteen

There was also sufficient evidence to support convictions
on Counts Thirteen and Fourteen.  Bello surveilled the Rosenberg
home with Bautista.  When Bautista realized he could not
participate in the job, he told Bello to bring a gun with him.
Cooperators' testimony established that Bello did bring a gun
and used his red Nissan.  While Bello waited outside in the
Nissan, Minaya and Michel stole Ms. Rosenberg's money (including
euros) and jewelry while intimidating her with a gun.  Further,
Bello admits that the testimony established that he was involved
in this job and that it involved the brandishing of a firearm.[2]
(Bello Mem. 3.)  With this evidence, a reasonable jury could
find that Bello participated in this robbery and aided and
abetted the use of a firearm through his role as a driver and
supplier of the gun.

### c. Counts One and Two

Finally, Bello argues that there is not enough evidence to
connect him to the robbery and kidnapping conspiracies.[3]  He
takes issue with how the "bulk" of the conspiratorial testimony

---

[2] Bello's discussion of another time that testimony suggested he loaned
Minaya a gun is beside the point.  Count Fourteen—the only gun charge
against Bello—is in connection with Count Thirteen.
[3] Bello also argues that there was no evidence to connect him to the
robbery or kidnapping of Gregorio Nunez.  However, he was not charged
in connection with that incident.

against him came from Bautista.  However, the testimony of even
a single co-conspirator can be sufficient to convict.  See United
States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) ("The
testimony of a single accomplice is sufficient to sustain a
conviction so long as that testimony is not incredible on its
face and is capable of establishing guilt beyond a reasonable
doubt." (internal quotation marks omitted)).  Similarly, while
he perceives inconsistencies in the cooperators' testimony,
those differences do not affect the sufficiency of the evidence;
rather, they are for the jury to consider as to weight.  See id.

Bello contends that "an occasional foray into a robbery or
a kidnapping does not make someone a member of a conspiracy."
(Bello Mem. 5.)  He acknowledges, however, that the evidence
viewed in the light most favorable to the Government established
that "he was involved in three or four possible jobs." (Bello
Mem. 3.)  That alone could be sufficient to show more than an
"occasional foray." See United States v. Nusraty, 867 F.2d 759,
764 (2d Cir. 1989) ("[A] pattern of acts . . . reflecting the
defendant's participation in a criminal scheme" could support
sufficiency); cf. United States v. Calbas, 821 F.2d 887, 892 (2d
Cir. 1987) (defendant's presence at three separate narcotics
transactions within a year sufficient to demonstrate knowledge
of the conspiracy).

Of course, the jury also heard testimony sufficient to show that Bello was more than just present at those jobs.  In addition to the robberies of Ms. Rosenberg and the barber discussed above, Bello also participated in the robbery and kidnapping of Nardello, which was charged as an overt act in both conspiracy counts.  Bello met with Bautista and others to coordinate the attack.  He travelled in Rodriguez's van to Nardello's home and was in the van while she was in it.  While she was driven around, her home was robbed by other crew members.  Afterward, Bello received a share of the spoils.

Viewing this evidence in the light most favorable to the Government, Bello took an active role in at least three of the crimes that were part of the overarching robbery and kidnapping conspiracies.  A reasonable jury could find that Bello's presence and participation advanced the goals of both the robbery and kidnapping conspiracies by coordinating, planning, and assisting in several robberies and one kidnapping.  Since there is sufficient evidence to show he joined the conspiracies, his relatively limited role is of no significance.  See United States v. Romero, 897 F.2d 47, 50 (2d Cir. 1990) ("A conspirator need not be proven to have known of all the details of the broader conspiracy . . .").

The Court finds the evidence sufficient to support Bello's conviction on all counts.  His motion for acquittal is therefore denied.

### 4. Bello's Rule 33 Motion

Bello makes three arguments to support his motion for a new trial: (1) the cooperating witnesses were "morally corrupt and evil"; (2) Bello did not receive a fair trial because he was tried along with co-conspirators who were charged with more counts; and (3) Bello did not receive a fair trial because evidence was admitted demonstrating that Minaya's mother contacted a witness and the Court gave a consciousness of guilt charge as to Minaya.

Bello points to no specific evidence to show that the cooperating witnesses were "morally corrupt and evil."[4]  They certainly were no angels, but accomplices in a case like this never are.  Moreover, the jury is in the best position to evaluate the character and credibility of witnesses.  In fact, during summations, the Government and each defendant urged the jury to consider the character and credibility of the

---

[4] If, as the Government suggests, "morally corrupt and evil" is meant to imply that the witnesses committed perjury, Bello has not demonstrated that any of the witnesses actually committed perjury. <u>See United States v. Zichettello</u>, 208 F.3d 72, 102 (2d Cir. 2000) (establishing that the witness actually committed perjury is necessary to justify reversal).

cooperating witnesses.  The Court's charge also included instructions on accomplice testimony. (Trial Tr. 1718-21.) Thus, the testimony of the cooperating accomplice witnesses did not deprive him of a fair trial.  Nor was Bello deprived of a fair trial by being tried along with Minaya and Rodriguez. See United States v. Spinelli, 352 F.3d 48, 55 (2d Cir. 2003) ("Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." (internal quotation marks and alteration omitted)); United States v. Locascio, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.").  Here, Bello was more than marginally involved.

Finally, as to the consciousness of guilt charge, Bello did not object to the testimony of Luis Rodriguez or George Vasquez nor did he cross-examine them.  The Court explicitly charged the jury to only consider the evidence as to Minaya, and a jury is presumed to follow a judge's instructions. Weeks v. Angelone, 528 U.S. 225, 234 (2000).  The Court's charge did not deprive Bello of a fair trial.

In evaluating Bello's arguments, the Court finds no reason to believe that a manifest injustice occurred.  Bello's motion for a new trial is therefore denied.

## IV. Conclusion

For the foregoing reasons, Defendants motions for a

judgment of acquittal and for a new trial are denied.

**SO ORDERED.**

Dated:     New York, New York
           February 2 4, 2014

                                    John F. Keenan
                           United States District Judge